THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA, :
:
v. : 3:18-CR-114
: (JUDGE MARIANI)
ANGEL ROMEU, :
:
Defendant. :

## MEMORANDUM OPINION

### I. INTRODUCTION

On October 11, 2018, Defendant Angel Romeu filed a "Motion to Suppress Wire and Electronic Communication Obtained in Violation of Title III and the United States Constitution" (Doc. 37). Romeu asserts, in his motion and supporting documents, that the Order authorizing the wiretap of the intercepted communications was insufficient on its face, that the communications at issue were unlawfully intercepted pursuant to an Affidavit riddled with misstatements and omissions, and that the Government failed to comply with the proper sealing procedures of the intercepted recordings. (*Id.*). Romeu also requests a *Franks* Hearing to correct the Affidavit and ultimately moves to suppress the intercepted communications and evidence derived pursuant to the Order. (*Id.*). Romeu filed an accompanying brief (Doc. 39), to which the Government has filed a response (Doc. 50), and Defendant has filed a reply brief (Doc. 51). Thus, the motion has been fully briefed and is ripe for disposition. For the reasons herein, the Court will deny Defendant Romeu's Motion.

## II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

In 2016, Pennsylvania State Police were investigating a large-scale methamphetamine distribution organization that operated mainly within Schuylkill County, Pennsylvania. (Doc. 50, at 5). Pursuant to that investigation, on March 24, 2016, the District Attorney of Schuylkill County applied to the Superior Court of Pennsylvania for an Order authorizing the interception of wire and electronic communications of Defendant Angel Romeu. (Docs. 38-1; 38-3). The District Attorney's application asserted that law enforcement had probable cause to believe that Romeu was involved as a supplier in a drug trafficking organization. (Doc. 38-1; 38-3). Further, the application averred that there is "probable cause to believe normal investigative techniques (other than the relief presently requested) were tried and failed, or reasonably appear to be unlikely to succeed if tried or are too dangerous to employ." (Doc. 38-1, ¶ 5.c.). The basis for the application was the "Affidavit in Support of Application" sworn by Troy S. Greenawald, a Pennsylvania State Police officer (Doc. 38-3).

On that same day, March 24, 2016, President Judge Emeritus Correale Stevens ("Judge Stevens") of the Superior Court of Pennsylvania issued an Order granting authorization for the District Attorney's request to intercept the wire and electronic communications. (Doc. 38-2). Judge Stevens found that the District Attorney made a proper showing of probable cause to believe that Romeu was engaged in drug trafficking and that the investigation warranted a wiretap. (*Id.*).

On April 9, 2016, Romeu was arrested by the Pennsylvania State Police and charged with various Pennsylvania Drug Act offenses, including Conspiracy to Deliver and Possess with Intent to Deliver Drugs and Possession with Intent to Distribute Drugs. (Doc. 50, at 6). On March 28, 2018, a criminal complaint was filed by Homeland Security Investigations Special Agent John Arruda in the Middle District of Pennsylvania against Romeu charging one count of conspiracy to distribute and possess with intent to distribute methamphetamine. (*Id*.).

On April 3, 2018, the Government filed a two-count indictment against Defendant Romeu, alleging violations of conspiracy to distribute and possess with intent to distribute methamphetamine and possession with intent to distribute methamphetamine under Title 21 of the United States Code. (Doc. 1). Thereafter, the Commonwealth of Pennsylvania withdrew its charges against Romeu. (Doc. 50, at 7). On April 10, 2018, Magistrate Judge Joseph Saporito, Jr., arraigned Romeu, and Romeu entered a plea of not guilty. (*Id*.). On October 11, 2018, Romeu filed the instant pretrial motion. (Doc. 37).

### III. ANALYSIS

Defendant Romeu, in his motion and supporting briefs, sets forth several grounds to suppress evidence obtained from the interception of Defendant Romeu's telephone calls and text messages pursuant to the March 24, 2016, Order and the fruits of that evidence. (Doc. 37). First, Romeu asserts that the interception which was approved upon review of the March 24, 2016, Affidavit by Trooper Troy S. Greenawald amounts to an unlawful

interception pursuant to 18 U.S.C. § 2518(10)(a)(i).  (Doc. 39, at 5).  Next, Romeu argues that the Judge Stevens' March 24, 2016, Order is "facially deficient" under 18 U.S.C. § 2518(10)(a)(ii) and evidence derived therefrom should be suppressed.  (*Id.*).  Finally, Romeu argues that law enforcement failed to comply with the sealing requirements pursuant to 18 U.S.C. § 2518(8)(a), thus warranting suppression of the evidence derived from the wiretap.  (*Id.*).  The Court addresses each of Romeu's contentions separately.  For the reasons that follow, the Court will deny Romeu's motion to suppress.

## A. *Unlawful Interception of Communications Pursuant to 18 U.S.C. § 2518(10)(A)(i)*

Defendant Romeu sets forth two grounds in support of his argument that the communications at issue were unlawfully intercepted and should be suppressed pursuant to 18 U.S.C. § 2518(10)(a)(i).  First, Romeu argues that the March 24, 2016, Affidavit by Trooper Troy S. Greenawald (Doc. 38-3), which was submitted in support of the District Attorney's application for an order to gain authorization to intercept wire and electronic communications, on its face fails to furnish probable cause for the interception.  (Doc. 39, at 5).  Second, Romeu argues the Affidavit contains numerous misstatements and omissions made with reckless disregard for the truth that, when corrected under *Franks v. Delaware*, 438 U.S. 154 (1987), and *United States v. Yusuf*, 461 F.3d 374 (3d Cir. 2006), do not support a finding of probable cause or necessity pursuant to Title III (*id.*).  To that end, Romeu requests a *Franks* Hearing to correct the March 24, 2016, Affidavit by Trooper Greenawald.  (*Id.*).   For the reasons that follow, the Court rejects Romeu's arguments and

will deny his request for a *Franks* Hearing and suppression of the intercepted communication under 18 U.S.C. § 2518(10)(a)(i).  The Court will first address Romeu's arguments with respect to the Affidavit's showing of probable cause on its face and then address Romeu's arguments under *Franks v. Delaware*.

1.  <u>Title III Requirements</u>

Under 18 U.S.C. § 2518(10)(a)(i), an "aggrieved person . . . may move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter, or evidence derived therefrom, on the grounds that the communication was unlawfully intercepted."  A communication is unlawfully intercepted if "there is a failure to satisfy any of [the] statutory requirements that directly and substantially implement congressional intent to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device."  *United States v. Giordano*, 416 U.S. 505, 527 (1975).

As per *United States v. Vento*, 533 F.2d 838, 849 (3d Cir. 1976), the statutory requirements that directly and substantially implement Congress's intent are set forth in 18 U.S.C. § 2518(3), which provides that before issuing an order authorizing a Title III wiretap, a judge must determine, based on the application provided, that:

(a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of this chapter;

(b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception;

(c) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous;

(d) . . . there is probable cause for belief that the facilities from which, or the place where, the wire, oral, or electronic communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.

18 U.S.C. § 2518(3). In light of the statutory text, the Title III requirements can be summarized to require probable cause (pursuant to 18 U.S.C. § 2518(3)(a), (b), and (d)) and necessity for the wiretap (pursuant to 18 U.S.C. § 2518(c)). If any of the § 2518(3) requirements are not met by the wiretap application, "then the authorization and any surveillance pursuant to it were improper." *Vento*, 533 F.2d at 847. Additionally, if the surveillance is improper, then the interception is unlawful pursuant to 18 U.S.C. § 2518(10)(a)(i), and "the government could not use the fruits of that surveillance at trial or to further its investigation." *Id.*

## 2. Wiretap Affidavit's Basis for Probable Cause on Its Face

Romeu argues that the March 24, 2016, Affidavit fails to furnish probable cause on its face because the Affidavit's "recitation of facts in support of a probable cause finding amounts [*sic*] little more than speculation without adequate basis in actual observation of Mr. Romeu by law enforcement." (Doc. 39, at 31). The Court disagrees.

Title III requires an applicant to show probable cause in three different contexts. "[T]he first is that an individual has or is about to commit one of several enumerated

offenses . . . ; the second[,] that particular communications relating to the charged offense will be obtained through the interception; and third[,] that the premises where the interception will be made are being used in connection with the charged offense." *United States v. Armocida*, 515 F.2d 29, 35 (3d Cir. 1975).

Probable cause itself is a "fluid concept" that "turn[s] on the assessment of probabilities in particular factual contexts." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). It may be, and often is, inferred from "the type of crime, the nature of the items sought, the suspect's opportunity for concealment and normal inferences about where a criminal might hide [evidence]." *United States v. Jones*, 994 F.2d 1051, 1057 (1993). While "[p]robable cause . . . requires more than mere suspicion; . . . it does not require that the officer have evidence sufficient to prove guilt beyond a reasonable doubt." *Orsatti v. New Jersey State Police*, 71 F.3d 480, 482-83 (3d Cir. 1995). Accordingly, "because probable cause is a 'practical, nontechnical conception,' we are concerned with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *United States v. Stearn*, 597 F.3d 540, 554 (3d Cir. 2010) (quoting *Gates*, 462 U.S. at 231) (citation and quotations omitted). To that end, the Third Circuit has held that courts "must apply a 'common sense approach,' based on the totality of the circumstances, to determine whether there was probable cause." *O'Connor v. City of Phila.*, 233 F. App'x 161, 164 (3d Cir. 2007) (quoting *Paff v. Kaltenbach*, 204 F.3d 425, 436 (3d Cir. 2000)).

In support of his argument that the Greenawald Affidavit does not support a finding of probable cause on its face, Romeu argues:

> For example, in relation to the events of March 12, 2016, there is nothing in the Affidavit corroborating Greenawald's musings—nothing to corroborate that Bainbridge was in fact waiting on his supplier to arrive before 6:00 p.m.; nothing to corroborate the suggestion that the 'bag in [Mr. Romeu's] right hand' and the 'box under [Mr. Romeu's] right arm' related to drug trafficking; and nothing to corroborate the notion that the individual who texted Bainbridge after Mr. Romeu left wished to purchase methamphetamine or did so. This is the case even though law enforcement had the means to obtain corroboration—the Affidavit states that '[b]etween February 19, 2016 and March 19, 2016, a reliable confidential informant made four (4) 'controlled purchases' of methamphetamine from David Joseph Bainbridge, Jr., at locations within Schuylkill County, Pennsylvania at the direction of your Affiant." (Decl. Ex. C ¶ 41). Despite the existence of this confidential informant, however, the Affidavit does not state that any controlled purchases were attempted to confirm Greenawald's speculation that Bainbridge did not possess methamphetamine prior to Mr. Romeu's arrival and did possess it afterward.

(Doc. 39, at 32).

In making this argument, the Court finds that Romeu adds a requirement that is not necessary for a showing of probable cause when he asserts that additional controlled purchases should have been made or attempted to confirm that Bainbridge did not possess methamphetamine prior to Romeu's arrival at Bainbridge's residence and to confirm that he possessed methamphetamine thereafter. Romeu's argument that the Affidavit fails to establish probable cause on its face is premised upon several isolated passages which Romeu concludes are not corroborated. In so arguing, Romeu seems to assert that the Trooper needed to be certain of Romeu's guilt. *But see Orsatti*, 71 F.3d at 482-83 ("Probable cause . . . requires more than mere suspicion; . . . [but] it does not require that

the officer have evidence sufficient to prove guilt beyond a reasonable doubt."). To that end, the Affidavit need not provide corroboration for each and every statement, but rather the Trooper may draw reasonable conclusions based on his own experiences and common sense.

In reviewing the Greenawald Affidavit, the Court finds that the Affidavit on its face provides a sufficient showing of probable cause. The Affidavit makes clear that Romeu was not a target of the investigation until after law enforcement received a wiretap order for Bainbridge, an original target of the investigation, and from whom a confidential informant purchased methamphetamine (*see* Doc. 38-3, ¶ 55). The Affidavit then summarizes numerous telephone conversations which suggest that Bainbridge was supplying methamphetamine to more than six additional individuals. (*See id.* at ¶¶ 62-64, 76-79, 114-115). After Bainbridge ran out of his supply of methamphetamine, the Affidavit details numerous conversations where Bainbridge indicates to those individuals that he had no methamphetamine to supply, all of which occurred on or before March 12. (*See id.* at ¶¶ 100, 114-116). On March 12, 2016, at approximately 4:35 p.m., an incoming call was placed to Bainbridge from Jeremy Lutz, an individual to whom Bainbridge allegedly supplied methamphetamine. (*Id.* at ¶ 119). During that call, and in subsequent text messages and phone calls, Bainbridge ultimately advised Lutz that Bainbridge's source of methamphetamine would be at his residence before 6:00 p.m. on that day. (*See id.* at ¶¶ 119-127).

On March 12, 2016, at approximately 6:02 p.m., members of law enforcement observed a vehicle enter Bainbridge's driveway, and an Hispanic male, at the time believed to be Angel Romeu, exited the driver's side of the vehicle, quickly entered the residence, and was carrying a bag in his right hand.  (*Id.* at ¶¶ 130-131).  At 6:07 p.m., Romeu was seen exiting the Bainbridge residence carrying a box under his right arm, which he placed in the driver's side, rear seat of the vehicle, entered the vehicle, and subsequently departed.  (Doc. 38-3, ¶ 131).  Immediately thereafter, Bainbridge began meeting with methamphetamine customers throughout the evening of March 12, 2016, and cryptically advised a customer that he could provide methamphetamine.  (*See* Doc. 38-3, ¶¶ 133, 138-139).  Consequently, as the Government highlighted in its brief, "[t]he affidavit makes clear, based on intercepted communications over Bainbridge's phone, that Bainbridge was waiting for his supplier and Romeu, who was known to law enforcement and has a prior conviction for trafficking methamphetamine, shows up at the scheduled time for Bainbridge's supplier to arrive with a package.  This clearly lays the foundation for building probable cause to believe that Romeu is involved in drug trafficking."  (Doc. 50, at 33).  Put differently, the timing of the events and surrounding circumstances give rise to an inference that Romeu was, at this point, engaged in narcotics trafficking.

Thereafter, members of law enforcement followed Romeu to the Tiger's Den gas station located on State Route 0061, where he remained for a period of time.  (Doc. 38-3, ¶ 132).  He was then followed directly to a residence, which was presumed to be the

residence utilized for the storage of items related to this conspiracy. (*Id.* at ¶¶ 132, 134). On March 14, 2016, members of law enforcement began conducting physical surveillance of the residence believed to belong to Angel Romeu. (*Id.* at ¶ 141).

Over the course of the next few weeks, Romeu was seen at the Bainbridge Residence numerous times. On March 15, 2016, Romeu was observed exiting Bainbridge's residence and was seen approaching the passenger side of the vehicle before ultimately departing. (*Id.* at ¶ 145). On March 22, 2016, Romeu was seen exiting the Bainbridge residence carrying a bag similar to a duffel bag in his right hand. (*Id.* at ¶ 147). On that same day, a conversation intercepted on Bainbridge's phone revealed that Bainbridge cryptically asked if Romeu wanted to meet him for an exchange of narcotics, i.e., "gonna take a ride go grocery shopping get some apples or sumptin'?" (*Id.* at ¶ 161-162). Finally, on March 23, 2016, law enforcement saw Romeu arrive at Bainbridge's residence, where the following exchange was described in the affidavit:

171. On March 23, 2016 at approximately 8:56 a.m., members of law enforcement observed a dark colored, Chevrolet extended-cab pick-up truck bearing Pennsylvania Registration number RT66616 arrive at the residence of David Bainbridge and back in to the driveway. Angel Romeu was subsequently observed exiting the vehicle.

172. At approximately 8:57 a.m., David Bainbridge arrived at his residence operating his Chevrolet pick-up truck. Bainbridge parked next to the Romeu vehicle with his passenger door adjacent to that of the Romeu vehicle. Both Romeu and Bainbridge then opened the passenger doors of the Romeu vehicle. Both also examined the Romeu vehicle for a period of time. Bainbridge then briefly opened the passenger door of his vehicle.

173.    After a period of time, all doors to the Romeu vehicle were closed. Bainbridge entered the passenger side of his vehicle and removed what appeared to be a white, grocery type bag. Both Romeu and Bainbridge subsequently entered the Bainbridge residence. Your Affiant believes that the aforementioned bag was removed from the Romeu vehicle and placed in the Bainbridge vehicle for a brief period of time while the passenger doors to both vehicles were open.

174.    On March 23, 2016, at approximately 9:54 a.m., Angel Romeu was observed by members of law enforcement exiting the residence of David Bainbridge.  Romeu then entered the aforementioned Chevrolet pick-up truck and departed the area. Romeu then proceeded directly to his residence . . . .

(Doc. 38-3, ¶¶ 171-174).

In light of the foregoing, it sensibly follows that the Affidavit on its face provided sufficient facts to furnish probable cause pursuant to the three requirements under 18 U.S.C. § 2518(3) related to probable cause.  Based on his twenty-three years of experience as a member of the Pennsylvania State Police, the extensive training he received in narcotics investigations, Romeu's prior history of being involved in narcotics trafficking, and the extensive information obtained previously in the investigation as detailed above, Trooper Greenawald reasonably concluded that there was probable cause to believe Romeu was supplying methamphetamine to Bainbridge in satisfaction of 18 U.S.C. § 2518(3)(a). Moreover, because the investigation revealed Romeu's telephone number, which was in frequent contact with Bainbridge's telephone number, Greenawald reasonably concluded that intercepting Romeu's number would yield particular conversations concerning the narcotics trafficking thereby satisfying the requirements under 18 U.S.C. § 2518(3)(b) and

(d).  Accordingly, Romeu's argument that the Affidavit did not furnish probable cause on its face lacks merit.

### 3. Wiretap Affidavit Omissions and Misrepresentations

Romeu asserts that the March 24, 2016, Wiretap Affidavit contains numerous misstatements and omitted material facts with reckless disregard for the truth and, when corrected under *Franks v. Delaware*, 438 U.S. 154 (1987), and *United States v. Yusuf*, 461 F.3d 374 (3d Cir. 2006), the Affidavit would fail to satisfy the probable cause and necessity requirements pursuant to 18 U.S.C. § 2518(3)(a)-(d).  (Doc. 39, at 5, 36-51).  Accordingly, Romeu contends that, pursuant to *Franks*, he is entitled to a hearing to correct the Affidavit. (*See, e.g.,* Doc. 39 at 41, 43, 45.).  Romeu further asserts that because the Affidavit, after correction, would not support a finding of probable cause and necessity, the wiretap interception would be unlawful under 18 U.S.C. § 2518(10)(a)(i).  (Doc. 39, at 21). The Court disagrees and does not find that Romeu is entitled to a *Franks* Hearing or suppression of the intercepted communications.

In *Franks v. Delaware*, the United States Supreme Court held that a criminal defendant has a right to challenge the truthfulness of factual statements made in an affidavit of probable cause supporting a warrant.  438 U.S. 154.  The Court explained that

> [t]o mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of

supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient . . . . Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required. On the other hand, if the remaining content is insufficient, the defendant is entitled, under the Fourth and Fourteenth Amendments, to his hearing. Whether he will prevail at that hearing is, of course, another issue.

*Franks*, 438 U.S. at 171-72.

*Franks* dealt only with misstatements, but the Third Circuit Court of Appeals noted in *United States v. Frost*, 999 F.2d 737 (3d Cir. 1993), that the *Franks* test applies to situations where affiants have omitted information from the affidavit. *Id.* at 743 n.2 (citing *United States v. Calisto,* 838 F.2d 711, 714–16 (3rd Cir.1988).

In determining whether a statement was recklessly made, the Third Circuit has explained,

the rule is that an assertion is made with reckless disregard when viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported. This definition provides two distinct ways in which conduct can be found reckless: either the affiant actually entertained serious doubts; or obvious reasons existed for him to do so, such that the finder of fact can infer a subjectively reckless state of mind.

*United States v. Brown*, 631 F.3d 638, 645 (3d Cir. 2011) (internal citations and quotation marks omitted). Similarly, omissions are made with reckless disregard for the truth "if an officer withholds a fact in his ken that 'any reasonable person would have known that this was the kind of thing the judge would wish to know.'" *Wilson v. Russo*, 212 F.3d 781, 788

(3d Cir. 2000) (quoting *United States v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir. 1993)). Although *Franks* and its progeny dealt primarily with probable cause, the same analysis applies where the affiant omits or misstates material information with respect to the necessity requirement under Title III. *See, e.g., United States v. Robinson*, 513 F. Supp. 2d 169, 177 (M.D. Pa. 2007).

The right to a *Franks* Hearing is not absolute. Rather, "[t]he defendant must first (1) make a 'substantial preliminary showing' that the affiant knowingly or recklessly included a false statement in or omitted facts from the affidavit, and (2) demonstrate that the false statement or omitted facts are 'necessary to the finding of probable cause.'" *United States v. Pavulak*, 700 F.3d 651, 665 (3d Cir. 2012) (quoting *Yusuf*, 461 F.3d at 383-84).

"[The] preliminary showing [that a defendant must make] is no light burden and puts the defendant to task by requiring some offer of proof that materially false statements were recklessly or intentionally made." *United States v. Darby*, No. 1:14-CR-00123, 2015 WL 13344905, at *3 (M.D. Pa. Aug. 9, 2015). More specifically, a defendant must "allege with specificity what was false in the affidavit, must provide proof, must allege that the affiant had a culpable state of mind, and must allege that the remaining information is insufficient to support a finding of probable cause." *United States v. Yokshan*, 431 F. App'x 170, 173 (3d Cir. 2011) (citing *Franks*, 438 U.S. at 171-72). "Conclusory allegations of untruthfulness are insufficient to meet this burden; the defendant must provide an offer of proof contradicting the affidavit, such as sworn or otherwise reliable statements from witnesses." *Darby*, 2015

WL 13344905, at *3 (citing *Yokshan*, 431 F. App'x at 173). Similarly, conclusory allegations regarding the second element of materiality are insufficient to entitle a defendant to a *Franks* Hearing. *See, e.g., United States v. Heilman*, 377 F. App'x 157, 180 (3d Cir. 2010) (citing *Franks*, 438 U.S. at 155-56) (defendant must make a substantial preliminary showing that the omission or misstatement was necessary to the finding of probable cause or necessity).

Once a defendant has successfully made this preliminary showing, a defendant is entitled to a *Franks* Hearing. At the *Franks* Hearing, a "defendant must prove by a preponderance of the evidence 'that the affiant knowingly and deliberately, or with reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant,' and secondly, that the false statement or omission was material" to a finding of necessity. *Id.* at *4 (quoting *Yusuf*, 641 F.3d at 383).

In light of the requirements under Title III, to be entitled to a *Franks* Hearing, Romeu must make a preliminary showing that the Affiant Trooper Greenawald knowingly or recklessly made misstatements or omissions that undermine either a finding of probable cause or necessity, as required by 18 U.S.C. § 2518(3)(a)-(d). In so doing, as recited above, Romeu must point to specific statements in the Affidavit or specific omissions, offer proof that the statements were made or omitted recklessly, and demonstrate that the misstatements or omissions are necessary to the finding of probable cause or necessity. *Pavulak*, 700 F. 3d at 665.

## a. Omissions and Misstatements Relating to Probable Cause

Romeu points to three omissions and one misstatement related to probable cause which he asserts require correction under *Franks* and *Yusuf* and, when the Affidavit is corrected, it fails to support a finding of probable cause. (Doc. 39, at 32-34). After reviewing the omissions and misstatement to which Romeu points, the Court concludes that Romeu has not met his burden of showing that he is entitled to a *Franks* Hearing relating to probable cause.

Romeu first contends that in relation to the events of March 12, 2016,

> [t]he Affidavit omits mention of a red sport-utility vehicle that pole camera recordings (produced in discovery) show pulling into Bainbridge's driveway at 6:11 p.m. and departing Bainbridge's driveway at 6:13 p.m. Had the Affidavit mentioned the arrival of this red SUV, the issuing judge—even if she agreed that investigators had reason to believe Bainbridge was waiting on a drug delivery—likely would have concluded that investigators had no more reason to suspect Mr. Romeu of making the delivery than the unknown driver of the SUV.

(Doc. 39, at 32-33).

In making this assertion, Romeu fails to point to any specific evidence to support the claim. As discussed earlier, to be entitled to a *Franks* Hearing, "[t]he defendant must first (1) make a 'substantial preliminary showing' that the affiant knowingly or recklessly included a false statement in or omitted facts from the affidavit, and (2) demonstrate that the false statement or omitted facts are 'necessary to the finding of probable cause.'" *Pavulak*, 700 F.3d at 665 (quoting *Yusuf*, 461 F.3d at 383-84). Importantly, a defendant cannot satisfy his burden of showing entitlement to a *Franks* Hearing with only conclusory allegations.

*Heilman*, 377 F. App'x at 180.  A review of the record indicates that Romeu did not submit to the Court the pole camera recordings at issue or any other relevant evidence to substantiate the omission.  Without such evidence, Romeu's assertion is entirely unsupported and does not provide the showing necessary to justify a *Franks* Hearing.

Furthermore, even assuming *arguendo* that Romeu had satisfied the first *Franks* element, the Court does not find this omission necessary to the finding  of probable cause considering the other evidence gathered in the investigation which Romeu does not contravene.  Romeu does not contest the parts of the Affidavit which aver that there were *numerous* meetings and phone calls between Bainbridge and Romeu which law enforcement reasonably concluded were related to drug trafficking.  Additionally, Romeu had a history of distributing methamphetamine.  (*Id.* at ¶ 17).  While "[p]robable cause . . . requires more than mere suspicion; . . . it does not require that the officer have evidence sufficient to prove guilt beyond a reasonable doubt."  *Orsatti*, 71 F.3d at 482-83.  Romeu does not demonstrate how the alleged omission of the information regarding the SUV contradicts the trooper's inference, based on his own experience and training, that Romeu, in light of the totality of the circumstances not contested by Romeu, was engaged in narcotics trafficking.  As such, Romeu has failed to satisfy his burden of making a substantial preliminary showing" with respect to the pole camera omission.  *Yusuf*, 461 F.3d at 383.

Romeu then points to an omission of information contained in the Call Database Listing related to the events of March 12, 2016, which he contends is material on the following basis:

> The Call Database Listing (produced in discovery) indicates that the person who sent a text message to Bainbridge after Mr. Romeu departed the area shared an interest in vehicle rehabilitation and repair with Bainbridge, undermining the notion that his innocuous message, "Hey are you gna b around in an hour or so," related to a desire to purchase drugs.

(Doc. 39, at 33).

This omission is subject to the same defects as discussed above: Romeu fails to provide appropriate evidence to contradict the affidavit and the omission fails to consider the totality of the circumstances. The only evidence to which Romeu cites is a Call Database Listing which shows that on March 13, 2016, Bainbridge spoke to an individual bearing the telephone number (570) 294-6203. (Doc. 38-6, at 2). During that conversation, the intercepting officer provided the following synopsis: "DB talks to a guy about a 4 wheeler." (Doc. 38-6, at 2). This synopsis does not substantiate Romeu's claim that Bainbridge and the person who sent Bainbridge a text message clearly "shared an interest in vehicle rehabilitation and repair." (Doc. 39, at 33). According to the listing, the call occurred on March 13, 2016, but Romeu contends that it contradicts the text message sent on March 12, 2016. (Doc. 38-6, at 2). The Court cannot discern the relationship between the call and the text message, and Romeu does not provide any explanation. Additionally, the Court notes that, according to the Affidavit, the text message to which Romeu cites was sent from the

telephone bearing the number (570) 294-2903 (*see* Doc. 38-3, ¶ 138), yet the call in the database which Romeu references came from the telephone bearing the number (570) 294-6203 (Doc. 38-6, at 2). Again, Romeu provides no explanation for how these telephone numbers are related. Without any further evidence, the Court cannot conclude that Romeu provided sufficient evidence to satisfy his burden of showing that the omission was material to the finding of probable cause. *Yusuf*, 461 F.3d at 383.

Furthermore, in arguing that the omission was material, Romeu fails to consider how, among other things, on March 12, 2016, after Romeu departed the area, Bainbridge began sending messages to multiple individuals that cryptically suggested that he was now able to provide methamphetamine to them. (*See* Doc. 38-3, ¶¶ 133, 138-39). This, in light of the other facts – including Romeu's prior history, the Trooper's training, and the other circumstances uncovered in the investigation – adequately furnish probable cause to believe that Romeu was involved in the narcotics trafficking. Thus, again, Romeu failed to demonstrate how the omission of the Call Database Listing amounts to a material omission in the Affidavit and contravenes a finding of probable cause.

Next, Romeu asserts that the following omission is also material:

Neither the pole camera records nor the surveillance reports from the relevant hour on March 12, 2016 record Mr. Romeu carrying a bag into Bainbridge's house, raising the prospect that Greenawald intentionally or recklessly invented this "fact" in order to suggest that Mr. Romeu was delivering methamphetamine.

(Doc. 39, at 33).

Romeu has again failed to come forth with evidence to indicate that either the pole camera records or surveillance report cover this time or that they, in fact, suggest what he asserts. Under the standard to establish entitlement to a *Franks* Hearing, "[c]onclusory allegations of untruthfulness are insufficient to meet this burden; the defendant must provide an offer of proof contradicting the affidavit, such as sworn or otherwise reliable statements from witnesses." *Darby*, 2015 WL 13344905, at *3 (citing *Yokshan*, 431 F. App'x at 173). Romeu has not provided any sworn or otherwise reliable statements or even the recordings themselves for the Court to ascertain the veracity of his claim. Without any further support, Romeu's assertion is entirely conclusory and fails to satisfy the standard necessary to demonstrate an entitlement to a *Franks* Hearing.

Finally, Romeu argues that the following "misstatement" exists within the Affidavit:

And in relation to March 23, 2016, a pole camera recording show [*sic*] Greenawald's "belie[f] that the aforementioned sequence of events shows that Angel Romeu is the supplier of methamphetamine to David Bainbridge" to be a recklessly misleading non sequitur. (Decl. Ex. C ¶¶ 171-75). The recording shows two men examining a truck from front to back over the course of approximately eight minutes. In light of the fact—recognized by the Affidavit (Decl. Ex. C ¶ 40)—that Bainbridge "operate[d] a mechanical garage in the vicinity of his residence," the only reasonable conclusion to draw from the surveillance is that Bainbridge was being consulted with respect to the vehicle.

(Doc. 39, at 33-34).

Yet again, Romeu failed to provide any further evidence – such as a sworn statement that Romeu was consulting Bainbridge with respect to the vehicle – as required under the *Franks* standard to show either that the statement was knowingly or recklessly

false or that the statement was necessary to a finding of probable cause. *See Pavulak*, 700 F.3d at 665. Romeu's assertion is again entirely unsupported in the manner required by *Franks*.

Additionally, nothing from the recording, as described by Romeu in his brief, suggests that the *only* reasonable conclusion to draw from the surveillance is that Bainbridge was inspecting the vehicle. "The fact that an innocent explanation may be consistent with the facts alleged . . . does not negate probable cause." *United States v. Fama*, 758 F.2d 834, 838 (2d Cir. 1985); *see also United States v. Westley*, 2018 U.S. Dist. LEXIS 109909, at *30-31 (D. Conn. July 2, 2018) (rejecting argument that officer's observation of digital scales, zip lock baggies, and razor blades did not support finding of probable cause because the items are innocuous on their own, law enforcement observed no narcotics, and law enforcement had no information at the time that defendant sold drugs or that his residence was connected to drug trafficking). The Court notes that Romeu's account is a selective recitation not based on an accurate description of the contents of the Affidavit. The complete recitation of the passage describes Bainbridge parking his vehicle next to the Romeu vehicle, "with his passenger door adjacent to that of the Romeu vehicle." (Doc. 38-3, ¶ 172). Romeu and Bainbridge then opened the passenger doors of the Romeu vehicle, examined the vehicle for a period of time, and Bainbridge then opened the passenger doors of the Bainbridge car. (*Id.*). Thereafter, all of the doors were closed and Bainbridge removed "what appeared to be a white, grocery type bag." (*Id.* at ¶ 173).

"[T]he confluence of factors independently susceptible of innocent explanation may provide the requisite basis for a finding of probable cause." *United States v. Garcia*, 848 F.2d 58, 60 (4th Cir. 1988) (citing *Gates*, 462 U.S. at 245 n.13 ("[I]nnocent behavior frequently will provide the basis for a showing of probable cause.")). "[P]robable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts." *District of Columbia v. Westby*, 138 S. Ct. 577, 588 (2018) (ruling that "the panel mistakenly believed that it could dismiss outright any circumstances that were 'susceptible of innocent explanation.' For example, the panel majority brushed aside the drinking and the lap dances as 'consistent with' the partygoers' explanation that they were having a bachelor party"). Indeed, as previously noted herein, probable cause "does not require that the officer have evidence sufficient to prove guilt beyond a reasonable doubt." *Orsatti*, 71 F.3d at 482-83. Here, the type of careful placement of the vehicles and the observed removal of a bag are not consistent with and undermine Romeu's assertion that "the only reasonable conclusion to draw from the surveillance is that Bainbridge was being consulted with respect to the vehicle," (Doc. 39, at 33-34), but are consistent with an inference that Romeu was involved in narcotics trafficking. Romeu's benign explanation in no way undermines a finding of probable cause. Indeed, the Court considers the totality of the circumstances, and this fact informs the reading of the entire affidavit, which as a whole shows a "probability or substantial chance of criminal activity." *Gates*, 462 U.S. at 267. Accordingly, because Romeu has failed to provide any evidence to substantiate his claim and the Court rejects his

assertion that the "only reasonable conclusion to draw from the surveillance is that Bainbridge was being consulted with respect to his vehicle" (Doc. 39, at 34), Romeu has failed to show how this statement meets the requirements to entitle him to a *Franks* Hearing.

In light of the above, Romeu has failed to make a "substantial preliminary showing" that Greenawald knowingly or recklessly included a false statement or omission that is "necessary to the finding of probable cause." *Pavulak*, 700 F.3d at 665 (quoting *Yusuf*, 461 F.3d at 383-84). Notably, Romeu has not provided *any* offer of relevant proof to support any of his claims despite bearing the burden to do so. Nor has Romeu demonstrated how, had the Affidavit been corrected in the way Romeu suggests, it would undermine a finding of probable cause. *See Darby*, 2015 WL 13344905, at *3 (citing *Yokshan*, 431 F. App'x at 173). As such, Romeu has failed to meet his burden of showing that he is entitled to a *Franks* Hearing on this basis and no correction is merited. Accordingly, because the Court finds that no correction is merited, and because the Court determined that the March 24, 2016, Affidavit supported a finding of probable cause on its face, the Court rejects Romeu's argument that Greenawald's Affidavit did not provide a sufficient showing of probable cause to render the interception unlawful pursuant to 18 U.S.C. § 2518(10)(a)(i).

### b. Omissions and Misstatements Relating to Necessity

Romeu asserts that "the [March 24, 2016] Affidavit's statement concerning the need for interception—in particular, its representations regarding the shortcomings of infiltration, confidential sources, and physical surveillance—is riddled with recklessly false representations and recklessly misleading omissions that, when corrected, render the Affidavit's attempted showing insufficient as a matter of law." (Doc. 39, at 38). On this basis, Romeu requests a *Franks* Hearing to correct the Affidavit. The Court concludes that Romeu has not satisfied his burden of showing entitlement to a *Franks* Hearing.

With respect to the necessity requirement, an application for authorization of a wiretap must contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). The requirements of 18 U.S.C. § 2518(3)(c) are "designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime," *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974), and the statute safeguards against wiretapping "procedures [being] routinely employed as *the initial step* in the investigation." *Giordano*, 416 U.S. at 515 (emphasis added). To that end, the Third Circuit has emphasized that 18 U.S.C. § 2518(3)(c) "does not require the government to exhaust all other investigative procedures before resorting to electronic surveillance." *United States v. Williams*, 124 F.3d 411, 418 (3d Cir. 1997). Rather, the Government "need only lay a 'factual predicate'

sufficient to inform the [authorizing] judge why other methods of investigation are not sufficient." *United States v. McGlory*, 968 F.2d 309, 345 (3d Cir. 1992) (quoting *Armocida*, 515 F.2d at 38); *see also United States v. Daly*, 535 F.2d 434, 438 (8th Cir. 1976).

The Third Circuit has characterized the government's burden of proof for showing compliance with the necessity requirement as "not great." *Armocida*, 515 F.2d at 38. "The government's burden is minimal because [the Court has] adopted a pragmatic approach toward the necessity requirement." *Vento*, 533 F.2d at 849 (quoting *Armocida*, 515 F.2d at 37).

To determine whether the Government has made the required showing, the court "may properly take into account affirmations which are founded in part upon the experience of specially trained agents." *Williams*, 124 F.3d at 418 (quoting *United States v. Ashley*, 876 F.2d 1069, 1072 (1st Cir. 1989)). Additionally, "[t]he government's showing is to be 'tested in a practical and commonsense fashion.'" *McGlory*, 968 F.2d at 345 (quoting *United States v. Vento*, 533 F.2d 838, 849 (3d Cir. 1976)). A certain degree of success with one or more investigative techniques does not negate the government's need for the wiretap. *See, e.g., United States v. Yeje-Cabrera*, 430 F.3d 1, 10 (1st Cir. 2005) (rejecting defendant's argument that "the government did not do enough to exhaust traditional investigative methods before resorting to the wiretap); *United States v. Canales Gomez*, 358 F.3d 1121, 1227 (9th Cir. 2004) (finding that the government does not need to exhaust all possible informants before obtaining a wiretap); *United States v. Bennett*, 219 F.3d 1117, 1122-23

(9th Cir. 2000) ("[T]he mere attainment of some success during law enforcement's use of traditional investigative methods does not alone serve to extinguish the need for a wiretap.").

In evaluating necessity concerning the investigation of a conspiracy, the court must consider the application in light of the specific goals pursued by the investigation at hand and it is well established that a wiretap may be used in investigating the full scope and nature of a drug conspiracy. *United States v. Bailey*, 840 F.3d 99, 116 (3d Cir. 2016) (citing *United States v. Vento*, 533 F.2d 838, 852 (3d Cir. 1976)). In *United States v. Ellis*, 693 F. App'x 137 (3d Cir. 2017) (not precedential), the Third Circuit panel noted that "[i]n *Bailey*, although confidential informants had already made controlled purchases from the leader of a drug-trafficking organization, we upheld interceptions of his telephone communications in part because 'arresting [him] alone would have frustrated the goals of the broader investigation.'" *Id.* at 139 (quoting *Bailey*, 840 F.3d at 114–15). *Ellis* added that "[o]ur sister circuits agree this is a proper reason." *Id.* (citing *United States v. Reed*, 575 F.3d 900, 911 (9th Cir. 2009)). Applying the principle to the circumstances of the case, *Ellis* set out the following:

> The application's stated purpose was to identify the remaining co-conspirators, the precise manner in which their criminal organization operates, and to dismantle the criminal organization through successful arrests and prosecutions of those involved. . . . Thus, the Application could (and did) satisfy § 2518(1)(c) by showing other investigative techniques, even if used against Ellis, were or would likely be unable to achieve the goals of the overarching investigation to which the Application relates—*e.g.*, "identify[ing] the remaining coconspirators, determin[ing] the precise manner in which their criminal

> organization operates," or uncovering the scope of a conspiracy of which Ellis was a member

693 F. App'x at 140. Thus, *Ellis* evaluated the necessity of intercepting the target telephone in light of the overarching purpose of the investigation.

As noted in *Ellis*, other Circuit Courts agree that section 2518(1)(c)'s necessity requirement is met where other investigative tools reasonably appear to be unlikely to sufficiently expose the full extent of a conspiracy as in when investigating officers had not been able to determine from other investigative methods the scope of the suspected conspiracy or to develop enough evidence to successfully prosecute the suspects whom they had identified. *See, e.g., United States v. Macklin*, 902 F.2d 1320, 1326-27 (8th Cir. 1990).

As applied to § 2518(3)(c)'s necessity requirement, "[a] *Franks* hearing is appropriate where the defendant makes a substantial preliminary showing that a false statement was (1) deliberately or recklessly included in an affidavit submitted in support of a wiretap, and (2) material to the district court's finding of necessity." *United States v. Shryock*, 342 F.3d 948, 977 (9th Cir. 2003) (citing *United States v. Bennett,* 219 F.3d 1117, 1124 (9th Cir.2000)); *see also United States v. Heilman*, 377 F. App'x 157, 180 (3d Cir. 2010). The same analysis applies where an affiant is alleged to have omitted material information from an affidavit. *Frost*, 999 F.2d at 743 n.2. Where a defendant demonstrates that the affiant knowingly or recklessly made a misrepresentation or omission, the court must determine

whether the affidavit would still demonstrate necessity if the correct information were included. *Id.* at 742-43.

In this matter, at the outset of its "Need for Interception" section, the Affidavit submitted in support of the wiretap interception application (Doc. 38-3) states the following:

> 176. In your Affiant's experience and the experience of other investigators in the case, the following techniques normally are used to investigate violations of drug trafficking and money laundering statutes:
>
>     a. Infiltration by undercover officers;
>     b. Review of telephone records, including pen register results;
>     c. Review of general background and records of suspected dealers;
>     d. Grand Jury and general questioning, with or without grants of immunity;
>     e. Use of confidential sources (informants);
>     f. Physical surveillance; and,
>     g. Search warrants.
>
> 177. As set forth below, each of the above techniques has been attempted but failed to identify the full, extent and volume of, or resulted in only limited success in further identifying the David Bainbridge / Angel Romeu organization's drug transportation and distribution activities (e.g.; the members of the organization, the role each plays, the locations where the drugs are stored, and the whereabouts of drug and money laundering proceeds); and appears reasonably unlikely to succeed because of the particular circumstances of the case; or is too dangerous to employ.

(Doc. 38-3, at ¶¶ 176-77).

While Trooper Greenawald identified seven traditional methods of investigation which had been attempted in the investigation, Romeu takes issue specifically with only three of them. He contends that Trooper Greenawald recklessly or deliberately omitted or misstated information regarding the infiltration by undercover officers, the use of confidential

sources, and the use of physical surveillance. (Doc. 39, at 33-34). He further contends that the recklessly or deliberately omitted and misstated information establishes that he is entitled to a *Franks* Hearing. (*id.* at 33-34). The Court addresses each of Romeu's contentions below.

To assess Romeu's claimed deficiencies in the proper context, the Court must consider the goals of the investigation identified in the necessity section of the Affidavit. *See Ellis*, 693 F. App'x at 139. The Affidavit specifically avers that the goals of the investigation included,

> identification and successful prosecution of all of the members of this organization; identifying and successfully prosecuting the organization's sources of supply, above Angel Romeu; locating the various residences and/or businesses used by the organization to store and distribute drugs; and learning how the organization launders proceeds of its drug trafficking activities and identifying assets obtained by use of illegal drug proceeds.

(Doc. 38-3, at ¶ 184).

*i. Infiltration by Undercover Officers*

Romeu asserts that the Greenawald Affidavit misrepresented the "futility" of attempting to infiltrate the "Bainbridge criminal organization." (Doc. 39, at 38 (citing Doc. 38-3, ¶ 179-180)). More specifically, Romeu contends that the state troopers could have used an undercover officer to infiltrate the organization or could have used the confidential informant to introduce the undercover officer into the organization. (Doc. 39, at 39-41). The Court does not find the Affidavit defective on the basis alleged.

In support of his assertion that the Affidavit misrepresented the nature of the

organization, Romeu points to statements contained in the "Infiltration by Undercover

Officers" section of the Affidavit:

> regarding the futility of attempting to infiltrate the "Bainbridge criminal organization" because the organization's members "do not trust unknown or new individuals," are "extremely leery of new individuals," "do not reveal information readily to newcomers," "tend to keep the inner workings of the organization a secret," are "very loyal to the organization," and "are not willing to share any information related to the organization's activities with others." (Decl. Ex. C ¶ 179-80).

(Doc. 39, at 38-39). Romeu contrasts these assertions made in the Wiretap Application

Affidavit of March 24, 2016, with information contained in the Affidavit submitted with the

Search Warrant Application of April 6, 2016:

> as early as "January 2016," investigators were working with a reliable confidential source of information who allegedly was "present with another individual who purchased a large amount of methamphetamine from Angel," Mr. Romeu, at JM Auto Service. According to this second affidavit, the reliable confidential source on "numerous occasions" was "present with the aforementioned methamphetamine customer . . . when the trafficking of methamphetamine was discussed . . . at JM Auto Service." (Decl. Ex. E ¶¶ 193-94). "[D]uring these conversations, [Mr. Romeu] related that JM Auto service was a "front" so [Mr. Romeu] could 'wash' the money he earned from the sale of methamphetamine." (Decl. Ex. E ¶ 195).

(Doc. 39, at 39-40).

Romeu's assertions encompass two issues—misstatements regarding the

characterization of the criminal organization and omission of information about a confidential

informant's contact with Romeu.

Regarding infiltration by an undercover agent, Trooper Greenawald avers the following in the Wiretap Affidavit:

178.    Investigators have not been, and are unlikely to be, successful in introducing undercover officers to members of the Bainbridge criminal organization.  Undercover officers have difficulty in identifying and interacting with all the co-conspirators or the organization's sources of supply.  In your Affiant's opinion, it is not likely that undercover operations will gather sufficient evidence to identify and successfully prosecute all the members of the criminal organization, including the sources of supply and money laundering techniques.  Organizational leaders in criminal organizations typically try to insulate themselves from undercover operations by having lower-level members deal with relatively unknown persons or little-known persons, like undercover officers.  In your Affiant's experience, it is very unlikely that an undercover officer could gain sufficient confidence and trust from such a close-knit group as this criminal organization.  In addition, undercover purchases of drugs will not enable the undercover agent/officer to penetrate the organization's highest levels and become privy to closely-guarded secrets, such as a supplier's identity, the location or locations of large quantities of controlled substances and cash/proceeds, the identities and roles of all the participants in the organization, and the full scope and methods of the organization.

179.    Additionally, the successful introduction of an undercover officer into a group of conspirators almost always requires a cooperating individual (CI). Though this investigation has been supplemented greatly by cooperating individuals, they have not been able to introduce undercover officers to the Bainbridge / Romeu organization's dealers nor its suppliers, mainly because they do not know who some of the dealers are, and do not know the identities of the ultimate suppliers of the methamphetamine.  CI # 1 has been unable to introduce undercover agents to any person(s) in the Bainbridge / Romeu organization due to the fact that the members of this organization do not trust unknown or new individuals.  There are, undoubtedly, individuals within the Bainbridge / Romeu organization that facilitate the distribution and or transaction of controlled substances activities by taking telephonic orders and dispatching runners or dealers to various locations to conduct these transactions with customers, but it is unlikely that an undercover officer would be able to penetrate beyond such street dealers and move up the chain.  It is also unlikely that undercover agents will be able to further penetrate the

Bainbridge criminal organization because members of this group appear to be extremely cautious even when dealing with known individuals, and do not want to deal with unknown individuals. Investigators have been able to identify that the Bainbridge / Romeu organization contains multiple levels and cells located in Schuylkill County with original sources of supply likely originating in Mexico. The introduction of undercover officers into the Schuylkill County cell would not reveal and identify the inner workings of the branch of the organization located elsewhere. In addition your Affiant knows, based on his training and experience, that the introduction of undercover officers into these types of organizations is extremely difficult and limited. These types of organizations are extremely leery of new individuals and do not reveal information readily to newcomers, and tend to keep the inner working relationships a secret. This would inhibit undercover officers from learning the full scope and the inner working relationships of different associates within the organization. This would also keep investigators from learning the associates' respective roles within the organization. Investigators also know that undercover officers would initially be introduced to "runners" or street dealers working for the organization, and it is very unlikely that the undercover agents would meet or be introduced to the upper levels of the organization in any one location. There is no likelihood that such undercover officers could meet and penetrate the upper-levels of the organization in all locations.

180.    Your Affiant believes that the introduction of undercover officers would only assist surveillances to identify "runners" within the Bainbridge / Romeu organization. Further, surveillances of undercover officers making purchases with/from "runners" would not reveal the entire scope of the operation in Schuylkill County, Pennsylvania, or the other parts of the country. Investigators would only be able to identify a limited number of associates, distributors, runners, and residences related to the organization. Your Affiant knows that members of the organization communicate directly through the Target Telephones and other related phones, and the interception of such communications could reveal the full scope of the organization and its criminal activities throughout the country, including, but not limited to, the organization's structure, the roles of the various associates, stash locations, sources of supply, and the manners in which the organization launders its illegal proceeds.

181.  Your Affiant believes, based on his training and experience, that it would be extremely unwise, as well as dangerous, to have an undercover officer approach the Bainbridge / Romeu organization "cold" (which is without an entrusted member of the organization) as this would be ineffective for several

reasons. First, it would heighten Bainbridge's and his associates' suspicion because the organization is "close-knit." Members within the organization are known to be very loyal to the organization and are not willing to share any information related to the organization's activities with others. Investigators, even after debriefing several confidential sources and cooperating witnesses, still do not know the full extent of the organization's drug related activities nor the person or persons who supply drugs to the organization. Investigators have not learned the full extent of Bainbridge's money laundering activities.

182. In addition to the aforementioned, information obtained during this investigation indicates that David Bainbridge is purchasing methamphetamine in excess of five pounds (5 lbs.) at a time. Currently, the wholesale price of methamphetamine per pound in Schuylkill County, Pennsylvania is between $16,000 and $18,000. Furthermore, CI # 1, at the direction of members of law enforcement, is purchasing substantial quantities of methamphetamine from David Bainbridge. If is your Affiant's belief that Bainbridge would become extremely suspicious if CI # 1 were to attempt another person into the organization. The common business practice would be for CI # 1 to purchase additional narcotics from Bainbridge to supply another "customer", rather than introduce the "customer" to Bainbridge.

183. Lastly, due to the quantity of narcotics being purchased by Bainbridge at one time, it would not be financially feasible, even if an undercover officer were introduced to the organization, to purchase a quantity of methamphetamine that would force Bainbridge to introduce the undercover officer to Angel Romeu.

(Doc. 38-3, ¶¶ 178-183).

- *Characterization of the Criminal Organization*

As to alleged misstatements regarding the characterization of the organization, Romeu's attempt to show that statements in the Wiretap Affidavit are contradicted by statements in the later Search Warrant Affidavit are unavailing.

Under *Franks*, to show that he is entitled to an evidentiary hearing on the basis of alleged misstatements regarding the Wiretap Affidavit's characterization of the criminal

organization, Romeu must make a substantial preliminary showing that Trooper Greenawald knowingly or recklessly included false statements regarding the organization's character and demonstrate that the false statements were material to the finding of necessity, i.e., that the statements were necessary to lay a "factual predicate" sufficient to inform the authorizing judge why infiltration by an undercover officer was not sufficient. *McGlory*, 968 F.2d at 345.

Statements in the Search Warrant Affidavit that a confidential informant was "present with another individual who purchased a large amount of methamphetamine from Angel," was "present with the aforementioned methamphetamine customer . . . when the trafficking of methamphetamine was discussed . . . at JM Auto Service," and was present when Romeu "related that JM Auto service was a 'front' so [Mr. Romeu] could 'wash' the money he earned from the sale of methamphetamine" (Doc. 39, at 39, 40 (citations omitted)) demonstrate only that a confidential informant was in Romeu's presence when certain aspects of the drug operation were discussed. Such limited information does not contradict the guarded characterization of the organization set out in the Wiretap Affidavit for the reasons discussed below.

The Search Warrant recitation upon which Romeu relies implies that the confidential informant had a relationship with the large-scale buyer sufficient to be trusted to be present when he/she made a purchase from Romeu. The Search Warrant recitation further implies that the large-scale buyer had a relationship with Romeu. It can be inferred that the buyer

would not have been a stranger to discussions of methamphetamine trafficking and would have known or suspected that Romeu's business was a front for laundering drug proceeds. Thus, the Search Warrant Affidavit essentially points to limited instances of information being discussed in a setting where one individual (the large-scale buyer) had a relationship with the other two individuals and discussion of methamphetamine trafficking generally as well as certain aspects of Romeu's activities would likely have been known to the buyer and readily discussed between him/her and Romeu. Seen in this context, even as a bystander or observer to interactions between the buyer and Romeu, the confidential informant was not an "unknown" individual--the confidential informant's relationship with the large-scale buyer could, at the very least, have suggested to Romeu that the confidential informant had some familiarity with the criminal organization such that trafficking and laundering discussions would not contradict assertions regarding the generally guarded nature of the organization. Importantly, no information about levels of the organization above Romeu were discussed or revealed, i.e., the inner workings of the organization remained a secret to the confidential informant.

It is also noteworthy that both Affidavits indicate that the confidential informant was known in drug circles and had been for some time. (*See, e.g.*, Doc. 38-3, at ¶ 188, Doc. 38-5, at ¶ 193). Information discussed in the presence of such an individual does not indicate that an individual without such a history (such as an undercover officer) would have or could

have been in Romeu's presence during a drug transaction or be privy to the information discussed regarding drug trafficking and money laundering.

Romeu assumes but does not attempt to explain how the information contained in the second affidavit renders the characterizations of the Bainbridge/Romeu organization contained in the first affidavit misstatements. (*See* Doc. 38, at 39-41). The foregoing discussion indicates that no such assumption is warranted. Romeu presents no basis to conclude that the limited contact the confidential informant had with Romeu and the limited information gleaned by the confidential informant when in Romeu's presence render Trooper Greenawald's statements about the organization false. Therefore, Romeu does not make any showing that he is entitled to a *Franks* Hearing on the basis of the wiretap affidavit's characterization of the Bainbridge/Romeu organization.

- *Wiretap Affidavit Omissions*

Romeu's related assertion that the omission of information contained in the Search Warrant Affidavit from the Wiretap Affidavit entitle him to a *Franks* Hearing is also without merit.

For Romeu to show that he is entitled to a *Franks* Hearing on the basis of material omitted from the Wiretap Affidavit, he must show that Trooper Greenawald knowingly or recklessly omitted the cited information contained in the Search Warrant Affidavit of April 8, 2016, and that, if this information were included in the March 24, 2016, Wiretap Affidavit, the

Affidavit would not have demonstrated necessity. *Franks*, 438 U.S. at 172; *Calisto,* 838

F.2d at 714.

Romeu states that the omissions are reckless (Doc. 39, at 41), but he does not

discuss or present argument regarding the required knowing or reckless showing. *See*,

*e.g.*, *Heilman*, 377 F. App'x at 180. As to the materiality element of the required showing,

he frames his discussion in conclusory terms, stating that if the omitted information, which is

"so clearly material to a 'full and complete statement' of the use and potential for use of

normal investigative tactics to infiltrate the 'Bainbridge criminal organization,'" had been

included in the wiretap affidavit,

> it would have been apparent to the issuing judge that the intended target of the
> interception, Mr. Romeu, was indeed willing to "reveal information readily,"
> including "inner workings" and illicit "activities." Moreover, investigators need
> not have approached Mr. Romeu "cold"; the reliable source, whom Mr. Romeu
> supposedly "entrusted" enough to reveal that he was engaged in
> methamphetamine trafficking and money laundering, could have introduced an
> undercover investigator to Mr. Romeu. Without such material information—and
> confronted with affirmative misrepresentations to the contrary—the judge was
> deprived of the "full and complete statement" required to make a determination
> whether normal investigative procedure had been tried and failed or were likely
> to fail, a necessary predicate for the issuance of a valid interception order.

(*Id.* at 40-41). Romeu then concludes that the omissions must be corrected with a *Franks*

Hearing. (*Id.* at 41).

Assuming *arguendo* that the information contained in the Search Warrant Affidavit

was recklessly or knowingly omitted from the Wiretap Affidavit, Romeu must make a

substantial preliminary showing that, with the inclusion of the omitted material, the Affidavit

submitted in support of the wiretap does not contain sufficient content regarding infiltration by undercover officers to support a finding of necessity. *Franks*, 438 U.S. at 172.

As a threshold matter, the Court finds the conclusory speculation that the confidential informant could have introduced an undercover agent to Romeu does not come close to satisfying Romeu's burden of showing entitlement to a *Franks* Hearing. Romeu clearly overlooks the broad scope of the relevant inquiry and the purpose of the statutory necessity requirement, and he ignores the multiple limitations related to the infiltration by undercover officers set out by Trooper Greenawald in the Affidavit at issue. (*See* Doc. 83-3, ¶¶ 178-183). These analytical deficiencies are sufficient to conclude that further discussion of necessity related to the infiltration technique is not warranted. However, the Court will demonstrate the shortcomings of Romeu's position with a review of the relevant portion of the Wiretap Affidavit.

The Wiretap Affidavit details the risks involved with infiltration of an undercover officer (Doc. 38-3, ¶ 179) which are not controverted by statements found in the Search Warrant Affidavit indicating that a confidential informant gleaned certain information about the criminal organization while in Romeu's presence with a large-scale buyer on certain occasions in the winter months of 2015 (*see* Doc. 38-5, ¶¶ 193-195). The Affidavit avers that the introduction of an undercover officer could heighten the organization members' suspicions given the nature and structure of the organization. (*See* Doc. 38-3, ¶ 179). As the Affidavit notes, "undercover officers would initially be introduced to 'runners' or street

dealers working for the organization, and . . . it is very unlikely that the undercover agents would meet or be introduced to the upper levels of the organization in any one location." (*Id.*). Further, the Affidavit explains that if the state troopers used the confidential informant to infiltrate the organization, "Bainbridge would become extremely suspicious if CI # 1 were to attempt to introduce another person into the organization. The common business practice would be for CI # 1 to purchase additional narcotics from Bainbridge to supply another 'customer,' rather than introduce the 'customer' to Bainbridge." (*Id.* at ¶ 182).

Nothing in the Search Warrant Affidavit undermines these assertions. First, the fact that a confidential informant had limited contact with Romeu in the winter of 2015 does not suggest that he/she could introduce another individual to Romeu. As discussed above, it is apparent that the confidential informant was known in drug circles where an undercover officer would not have been. Second, the possibility of such an introduction does not undermine the negative/problematic aspects of the technique articulated in the Affidavit. Third, and most importantly, the potential placement of an undercover officer somewhere in the organization does not equate with a conclusion that the investigation's goal of discovering the scope of the conspiracy could be accomplished without the use of a wiretap.

On the third point, the Affidavit avers that, even if an undercover officer could be introduced into the organization, it would be unlikely that the undercover officer would become privy to the information needed to further the investigation. (*See id.* at ¶¶ 179--181). At this juncture, the investigation sought to identify the upper-level members of the

organization throughout Schuylkill County and other parts of the country. (*See id.* at ¶¶ 179-180). Because no evidence contradicts the Affidavit's assertions that an infiltrator could not gain access to information about the full scope of the criminal organization, the detailed limitations outlined in the Affidavit regarding infiltration support a conclusion that placement of an undercover agent would be unlikely to satisfy the goals of the investigation such that a wiretap would not be necessary. *Bailey*, 840 F.3d at 116; *McGlory*, 968 F.2d at 345. This is all the law requires. *Id.* Contrary to Romeu's conclusion that the information contained in the Search Warrant Affidavit suggests otherwise, on the multiple occasions the confidential informant was in the presence of Romeu, he/she did not obtain the information sought about the upper levels and full scope of the organization. As discussed above, Romeu's assertions that the Bainbridge criminal organization was "demonstrabl[y] incautious" and "Romeu, was indeed willing to 'reveal information readily,' including 'inner workings and 'illicit activities'" (Doc. 39, at 40) are unsupported.

The limited potential success of an undercover agent is further supported by the asserted financial infeasibility of making the type of large-quantity purchases that would allow an undercover officer to gain access to Romeu. (Doc. 38-3, ¶ 183). As set out above, the Affidavit states that "information obtained during this investigation indicates that David Bainbridge is purchasing methamphetamine in excess of five pounds (5 lbs.) at a time. Currently, the wholesale price of methamphetamine per pound in Schuylkill County, Pennsylvania is between $16,000 and $18,000." (*Id.* at ¶ 182). Thus, a controlled buy in a

quantity which may provide access to Romeu could be in excess of $80,000. No information contained in the record suggests that smaller quantity purchases would be equally viable to enable a potential undercover officer to infiltrate levels above Bainbridge. Further, no evidence suggests that the financial means necessary to purchase quantities in excess of five pounds were available to investigating officers. Therefore, no evidence undermines concerns that investigators would be unable to make the purchases necessary to make the infiltration tactic worthwhile. This conclusion, in turn, indicates that no evidence of record suggests that the use of an undercover agent would eliminate the need for a wiretap.

The foregoing discussion demonstrates why Romeu's reliance on *United States v. Simpson*, 813 F.2d 1462, 1471 (9th Cir. 1987), in the context of the asserted need for a *Franks* Hearing (Doc. 39, at 41) is misplaced. Romeu provides the following parenthetical material:

> government affidavit materially misleading and in need for correction where affidavit stated that suspect and his coconspirators "'insulated themselves'" and that undercover agents and confidential sources could not "'penetrate the organization to the highest levels because of insulation tactics utilized,'" when in fact a confidential source had established a "close friendship" with the suspect, "had been present on several occasions while [the suspect] conducted business with other members of the alleged drug ring," and "had become trusted enough to be permitted to identify potential drug purchasers for [the suspect]".

(Doc. 39, at 41 (citing *Simpson*, 813 D.2d at 1471)). As set out above, here the confidential informant had not developed a "close friendship" with Romeu—he/she had merely been in

Romeu's presence and no evidence suggests that he/she had become trusted enough to develop a direct relationship with Romeu or identify potential drug purchasers for him. Thus, *Simpson* actually highlights why Romeu's asserted entitlement to a *Franks* Hearing based on the informant's alleged ability to introduce an undercover agent to Romeu is without merit.

### ii. Use of Confidential Sources

Regarding his assertion that he is entitled to a *Franks* Hearing because of misstatements and omissions regarding the use of confidential sources, Romeu contrasts excerpts from Trooper Greenawald's Wiretap Affidavit concerning a confidential informant's relationship with the criminal organization with the information contained in the later Search Warrant Affidavit. (Doc. 39, at 42-43). For reasons similar to those identified above, Romeu's assertions do not satisfy his burden of showing entitlement to a *Franks* Hearing and are legally flawed.

In support of his assertion that he is entitled to a *Franks* Hearing based on misstatements and omissions regarding the use of confidential sources, Romeu specifically states the following:

> The existence of a reliable confidential source in whose company Mr. Romeu spoke freely renders the Greenawald Affidavit's representations concerning the paucity and ineffectiveness of confidential sources recklessly false. The investigators did have another reliable source. This reliable source had met Mr. Romeu (and Mr. Romeu had spoken freely in his company). Mr. Bainbridge may have taken steps to limit access to his supplier, but investigators nevertheless already had a reliable source with access to his supplier. Far from having "little to add" about Mr. Romeu, the reliable source supplied Trooper

Greenawald with information that Greenawald later used in an application to search Mr. Romeu's residence. And rather than having "no information" about "assets and the laundering of illegal proceeds," the reliable source specifically reported to investigators that JM Auto was a front organization used to wash money from methamphetamine sales.

(*Id.* at 42-43).

In the Confidential Sources section of the Wiretap Affidavit, Trooper Greenawald provides the following information:

184.    As noted above, several confidential sources have been identified and developed in this investigation, and only one of these confidential sources is conceivably positioned to make undercover purchases, or contacts. CI # 1 only knows and conducts narcotics transactions with one member of the organization, David Bainbridge. Having CI # 1 continue to assist in this case, therefore, while helpful, would not accomplish the goals of the investigation which include the identification and successful prosecution of all of the members of this organization; identifying and successfully prosecuting the organization's sources of supply, above Angel Romeu; locating the various residences and/or businesses used by the organization to store and distribute illegal drugs; and learning how the organization launders proceeds of its drug trafficking activities and identifying assets obtained by use of illegal drug proceeds.

185.    CI # 1 has become restricted and somewhat limited in dealings with members of the Bainbridge / Romeu organization. Having CI #1 purchase quantities of methamphetamine from members of the criminal organization every two weeks or so will not enable investigators to further infiltrate this organization. CI # 1 is not in a position to learn or be told about how the inner workings of how the Bainbridge / Romeu organization functions in every location in which it operates.  CI # 1 is not in a position to learn the identities and deal directly with the organization's supplier or suppliers of illegal drugs. Although CI # 1 has made several purchases of methamphetamine from David Bainbridge, CI # 1 has not met Angel Romeu or been present when Angel Romeu was in the company of David Bainbridge.

186.    In addition, the Bainbridge / Romeu organization appears to be compartmentalized and CL # 1 and other sources of information cannot provide

information regarding the entire scope of the organization, the organization's assets, the location of these assets, every location used for controlled substance storage, the methods used for transporting and distributing controlled substances, the identity of all the organization's members, or the manner in which this organization launders its proceeds. Also, as described above, CI # 1 and other sources of information only have access to certain members, and even that access has been limited because of the leader's suspicions. . . .

187. Officers and prosecutors do not believe that the investigations objectives can be accomplished based solely or even largely on CI #1's information and assistance since Bainbridge has taken steps to ensure that other members of the drug trafficking organization do not have access to his supplier throughout the investigation. . . .
. . .

189. Your Affiant and the other officers familiar with this case have no knowledge whatsoever that CI # 1 or other sources of information have ever been deliberately misleading in the information they have provided. However, a successful prosecution would be difficult if based solely on information obtained from Ci #1 and other sources of information. Second, CI # 1 would have nothing or very little to add to a case against other targets, including Angel Romeu, or his source(s) of supply. Third, some of CI # 1's knowledge was learned during conversations with certain targets and against some targets. Fourth, aside from the information above CI #1 has no information about others' involvement, including Angel Romeu, does not know if there are other sources or participants, does not know the major customers, and has no information about assets and the laundering of illegal proceeds.

(Doc. 38-3, ¶¶ 184-187, 189).

The discrepancy upon which Romeu focuses in this section of his brief is the

difference between the Wiretap Affidavit's indication that the confidential informant had not

"met" Romeu or gleaned information about the drug operation related to him and the Search

Warrant Affidavit's indication that the confidential informant had been in Romeu's company

with another individual and Romeu spoke of drug related matters when the confidential

informant was present.  (*Id.*).   Based on information contained in the Search Warrant Affidavit, it may be that CI # 1 had greater contact with Romeu than indicated in the wiretap Affidavit and that he/she gleaned limited information about the organization, i.e., that Romeu's garage was a front for laundering drug proceeds.  However, Romeu again provides speculation rather than argument in support of his conclusion that he is entitled to a *Franks* Hearing based on the identified discrepancy.  (Doc. 39, at 42-43).

Assuming *arguendo* that the wiretap Affidavit contained misstatements regarding a confidential informant's interaction with Romeu and, further assuming *arguendo* that the misstatements were recklessly or knowingly made and, as discussed above, the omission of information contained in the search warrant affidavit was knowing or reckless, Romeu must make a substantial preliminary showing that, with the inclusion of the omitted material, the Affidavit submitted in support of the wiretap does not contain sufficient content regarding the use of confidential sources to support a finding of necessity.  *Franks*, 438 U.S. at 172.

With his brief discussion, devoid of legal citation, Romeu neither acknowledges the showing required under *Franks* nor analyzes the Wiretap Affidavit's assertions regarding the use of confidential sources beyond phrases cherrypicked from seven paragraphs related to the use of confidential sources.  (*Id.* (citing Doc. 38-3, ¶¶ 184-90)).  Romeu clearly overlooks the broad scope of the relevant inquiry and does not attempt to undermine the multiple limitations related to the use of confidential sources set out by Trooper Greenawald in the Wiretap Affidavit as is his burden.  (*See* Doc. 38-3, ¶¶ 184-190).  However, rather

than dispose of Romeu's assertions based on this analytical deficiency, the Court will demonstrate the shortcomings of Romeu's position with a review of the relevant portion of the Wiretap Affidavit and related caselaw.

As set out above, Trooper Greenawald specifically averred that "the goals of the investigation . . . [included] the identification and successful prosecution of *all of the members of this organization*; identifying and successfully prosecuting the organization's sources of supply, *above Angel Romeu*; locating the various residences and/or businesses used by the organization to store and distribute illegal drugs; and learning how the organization launders proceeds of its drug trafficking activities and identifying assets obtained by use of illegal drug proceeds." (*Id.* at ¶ 184) (emphasis added)). As noted above, Romeu's brief is devoid of discussion of these goals.

Significantly, the record contains no indication that the confidential source who had been in Romeu's presence would have been able to further advance the investigation in light of the goals articulated in the Wiretap Affidavit, and it is those broad goals upon which the necessity inquiry is based, *see, e.g. Ellis*, 693 F. App'x at 139. The fact that the confidential informant had been in Romeu's presence does not indicate that the informant was close enough with Romeu that Romeu would trust the informant with any information about the organization's higher-level operations that were the goal of the investigation. *See, e.g.*, *United States v. Majeed*, Cr. No. 08-186, 2009 WL 2393921, at *82-83 (E.D. Pa. Aug. 4, 2009) (finding that omission that informant was cooperating at the time of application was

immaterial where informant was not clearly trusted and there was no indication that informant and defendant were close enough to elicit information). Here the Search Warrant Affidavit contains no information which demonstrates that the confidential informant was independently able to elicit information from Romeu. As discussed above, the case is distinguishable from *Simpson* where the confidential informant had a close friendship with the target and was demonstrably in a position of trust. *See supra* pp. 42-43. The Search Warrant Affidavit indicates that Romeu only spoke in the presence of the informant when the informant was accompanied by a customer of Romeu who was a buyer of large quantities of methamphetamine. Furthermore, the facts to which Romeu directs the Court's attention suggest that the informant's knowledge of the drug distribution network was limited to Romeu and the lower-level individuals with whom Romeu communicated. Thus, based on the omitted information, it does not follow that the informant likely could have elicited the information sought such that there would not be a need for a wiretap.

Rather than undermining the necessity of a wiretap, courts have found that the omission of information indicating greater contact between a confidential informant and a target of the investigation than that stated in the affidavit at issue provided further evidence of the confidential informant's limited success and the need for a wiretap where the additional contact did not lead to discovery of the scope of the investigation. *United States v. Robinson*, Crim No. 10-110(2), 2010 WL 39382328, at *10 (D. Minn. Sept. 16, 2010)

("informing the issuing judge that an undercover officer had been used without success would have only further supported a finding of necessity").

More importantly, even if the confidential informant could potentially have furthered the goals of the investigation, the government was not precluded from obtaining a wiretap to advance the investigation.  Here the record shows limited success of the one confidential informant who was "conceivably positioned" to obtain further information.  (Doc. 38-3, ¶ 184).  As set out above, relevant authority supports the necessity of a wiretap in such situations.  *See, e.g., Yeje-Cabrera*, 430 F.3d at 10 (1st Cir. 2005) (rejecting defendant's argument that "the government did not do enough to exhaust traditional investigative methods before resorting to the wiretap"); *Canales Gomez*, 358 F.3d at 1227 (finding that the government does not need to exhaust all possible informants before obtaining a wiretap); *Bennett*, 219 F.3d at 1122-23 ("mere attainment of some success during law enforcement's use of traditional investigative methods does not alone serve to extinguish the need for a wiretap."); *see also United States v. Hyde*, 574 F.2d 856, 868-69 (5th Cir. 1978) (wiretap necessary to ascertain full scope of conspiracy under investigation and gather evidence against leaders of organization where government had web of informants that revealed information regarding lower-level conspirators); *United States v. Tyson*, Crim. No. 08-232, 2009 WL 10678868, at *6 (D. Minn. Jan. 12, 2009) (where confidential informants and cooperating individuals had provided useful information but were not able to reveal the full scope of the conspiracy  court rejected defendant's claim that the government

should have fully exhausted the use of the confidential informant because there was "no argument and no factual showing that the government had uncovered the source of the drugs at issue in this case, had determined the identity of all co-conspirators, and had fully discovered the nature of the conspiracy").

This authority shows that the investigators in this case were not required to fully exhaust the confidential informant technique before applying for a wiretap simply because the informant had been in Romeu's presence and received some information as a passive observer. This conclusion is bolstered by Trooper Greenawald's averment that the best positioned confidential informant had "become restricted and somewhat limited in dealings with members of the . . . organization" (Doc. 38-3, ¶ 185) which implies diminished contact and more limited likelihood of obtaining information about higher levels of the organization.

In viewing the information Trooper Greenawald provided in his Affidavit in a "practical and commonsense fashion," *McGlory*, 968 F.2d at 345, no evidence suggests that Trooper Greenawald wrongly asserted the use of the confidential informant, in tandem with other traditional techniques as detailed in the Affidavit, was unlikely to yield information regarding the higher levels of the narcotics trafficking organization. While Romeu's counsel appears to assume that the confidential informant knew or could get to know Romeu well enough to advance the investigation to the degree that the informant could independently gain more information from Romeu and/or introduce an undercover infiltrator into the organization such that the goals of the investigation could be met and a wiretap would not be needed, such an

assumption is unsupported and borders on the fanciful. The information found in the Search Warrant Affidavit to which Romeu directs the Court's attention does not in any way vitiate the concerns and limitations with respect to the infiltration technique and use of a confidential informant detailed by Trooper Greenawald in the Wiretap Affidavit. Numerous courts have refused to invalidate a wiretap order "simply because defense lawyers are able to suggest *post factum* some investigative technique that it might have used and was [*sic*] not. It is enough if the affidavit explains the prospective or retrospective failure of several techniques that reasonably suggest themselves." *Hyde*, 574 F.2d at 867. Romeu's assertions are merely unsupported assumptions that, based on the on the omitted information, the state troopers would have been able to infiltrate the organization and would have been able to gain more wide-scale information through a confidential informant, i.e., the exact *post factum* suggestions that *Hyde* rejects.

### iii. Use of Physical Surveillance

Romeu further attempts to undermine the wiretap Affidavit's showing of necessity with the assertion that Trooper Greenawald misrepresented and omitted details regarding the state troopers' ability to use physical surveillance. (Doc. 39, at 43). More specifically, Romeu asserts that the Affidavit

> fails to disclose to the court that no later than March 15, 2016, investigators had obtained authority to install mobile tracking devices on two of the vehicles discussed in the application for interception, a Kia sedan and a Jeep SUV, both allegedly associated with Mr. Romeu. These devices would have allowed investigators to monitor Mr. Romeu's every movement in these vehicles.

(Doc. 39, at 43-44).  He also points to inaccurate information contained in the Affidavit regarding the use of a pole camera:

> investigators were not, as stated in the Affidavit, "considering the use of a pole camera . . . at the Bainbridge residence." A pole camera was already in use monitoring the Bainbridge residence no later than the first week of March 2016, and was the source of much of the information set forth in the Greenawald Affidavit to establish probable cause to intercept the communications of Mr. Romeu, belying the Affidavit's bemoaning of the supposed ineffectiveness of using this technique.

(Doc. 39, at 44).  Romeu concludes that "[b]y misrepresenting the use of physical surveillance in the course of the investigation, the Greenawald Affidavit again failed to set forth a 'full and complete statement' of whether or not interception was necessary." (*Id.*, at 44-45.)

The Government concedes "that a pole camera was in use prior to the application for the first wiretap on Romeu's phone" and acknowledges that this was "inconsistent with the statement made in the affidavit." (Doc. 50, at 26).  Further, the Government states that "[a]lthough the affidavit does not specifically mention the use of tracking devices, it does specifically discuss the limitations of physical surveillance." (*Id.* at 27).

While the Court finds that Trooper Greenawald misstated the use of physical surveillance with respect to the use of a pole camera and omitted information with respect to the approved use of tracking devices, Romeu has not attempted to show that the misstatement and/or omission are material to the finding of necessity.  As discussed in the two preceding sections of this Memorandum Opinion, to show entitlement to a *Franks*

Hearing, Romeu must do more than provide a conclusory statement that a misstatement or omission is material to the finding of necessity. Here it is Romeu's burden to make a substantial preliminary showing that, with the inclusion of the omitted material regarding the tracking devices and correction of the misstatement regarding the use of a pole camera, the Affidavit submitted in support of the wiretap does not contain sufficient content regarding the use of physical surveillance to support a finding of necessity. *Franks*, 438 U.S. at 172.

The Affidavit details that, at that juncture in the investigation, there were specific limitations to the use of physical surveillance. (*See, e.g.*, Doc. 38-3, ¶¶ 193-202). For example, the Affidavit states,

> while [physical] surveillance can provide some evidence of who associates with a target and what happens at certain times, by itself it cannot provide the kind of closely-held evidence (evidence for the most part only within the knowledge of the conspiracy's members) that investigators have thus far been unable to develop, e.g., the full scope of the Bainbridge / Romeu organization, all the members of the organization and their relationship to one another, all the locations where drugs are stored and distributed, and the location and identity of the illegal proceeds generated by the criminal operation.

(*Id.* at ¶ 196). The Affidavit then discusses the extent to which the investigators had used physical surveillance as an investigative tool, the limited information gleaned from such efforts, and the impediments encountered and anticipated in using physical surveillance tools to gain the information sought to move the investigation forward. (*Id.* at ¶¶ 197-202). Additionally, the Affidavit avers that "continued physical surveillance of Romeu without the aid of monitoring communications on his cellular phone . . . would also result in the

detection of law enforcement's presence by either Romeu or his confederates." (Doc. 38-3, ¶ 202).

As with his assertions regarding the use of an undercover officer and confidential sources, Romeu does not acknowledge or assess the multiple bases upon which the Affidavit asserts that physical surveillance alone will not satisfy the goals of the investigation. (*See* Doc. 39, at 43-36). As the Court found in the undercover officer and confidential source contexts, further discussion of the Affidavit's alleged shortcomings regarding physical surveillance is unwarranted based on Romeu's failure to make the requisite showing. However, the Court will briefly discuss the issue to demonstrate the inadequacy of Romeu's position.

The limitations of the physical surveillance investigative technique set out in the Affidavit remain even if the information regarding the pole camera and vehicle monitoring were included in the Affidavit. Romeu has not provided any evidence to suggest that physical surveillance could have yielded the information the state troopers sought. In *United States v. Heilman,* the Third Circuit rejected a defendant's argument that physical surveillance was material to a finding of necessity because "nothing [the defendant] points to proves that law enforcement could meet its investigatory objectives through physical surveillance." *Heilman,* 388 F. App'x at 182. Romeu has similarly failed to make any such showing

Romeu's conclusory reliance on *United States v. Carneiro*, 861 F.2d 1171 (9th Cir. 1988), is misplaced. In that case, the Ninth Circuit concluded that the officer misrepresented physical surveillance when it stated that physical surveillance of a suspect was "extremely difficult" when in fact the affidavit failed "to mention that the DEA never actually attempted to explore the possibility of physical surveillance until after the wiretap order was issued." *Carneiro*, 861 F.2d at 1180. Romeu does not analogize the case to the circumstances presented here where the Affidavit represented that physical surveillance was well underway and the successes and limitations of the technique were thoroughly discussed. Although the pole camera and vehicle monitoring tools--more specific types of physical surveillance--were omitted from the wiretap Affidavit's discussion, no evidence suggests that those methods do not suffer from the same limitations that Trooper Greenawald discussed with respect to physical surveillance as a more general investigative tool. Because the record is devoid of evidence which suggests that physical surveillance would satisfy the goals of the investigation such that a wiretap would not be necessary, *McGlory*, 968 F.2d at 345, Romeu is not entitled to a *Franks* Hearing on this issue.

iv. *"Boilerplate" Assertions*

Finally, Romeu argues that "[c]orrection of the Greenawald Affidavit's reckless misstatements and omissions leaves behind only boilerplate that fails to set forth the requisite "full and complete statement" of necessity that Title III requires. (Doc. 39, at 32). Because Romeu has not made the requisite showing under *Franks* with respect to the three

techniques which he argues warrant correction, the Court finds that Romeu's argument lacks merit. Further, the Court notes that the discussion of other techniques in the affidavit --review of telephone records, including pen register results; review of general background and record of suspected dealers; grand jury and general questioning, with or without grants of immunity; and search warrants – did not constitute mere boilerplate because they were in fact relevant to this narcotics investigation and were thoroughly discussed in the Affidavit.

With the foregoing findings, no evidence supports Romeu's assertions that the Wiretap Affidavit does not satisfy the probable cause and necessity requirements of 18 U.S.C. § 2518(3) or that the interception amounts to an unlawful interception under 18 U.S.C. § 2518(10)(a)(i). Thus, the Court will deny Romeu's request for a *Franks* Hearing and motion to suppress evidence on these bases.

### B. Sufficiency of March 24, 2016, Order Under 18 U.S.C. § 2518(10)(a)(ii)

Romeu contends that the Court should suppress the intercepted communications because the Order authorizing the wiretap is deficient on its face pursuant to 18 U.S.C. § 2518(1)(a)(ii). (Doc. 39, at 21, 25). The basis of his argument is that the authorizing Order did not explicitly address the requirement of 18 U.S.C. § 2518(3)(c) which authorizes a judge to issue an ex parte order authorizing or approving interception of wire, oral, or electronic communications if the judge determines, among other things, that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or be too dangerous." 18 U.S.C. § 2518(3)(c). As discussed

previously, this provision is referred to as the "necessity" requirement for a wiretap, where the other provisions identified in § 2518(3) require determinations based on probable cause. *See supra* pp. 5-6.

Under 18 U.S.C. § 2518(10)(a)(ii), "an aggrieved person . . . may move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter, or evidence derived therefrom, on the grounds that the order of authorization or approval under which it was intercepted is insufficient on its face." The precise contours of 18 U.S.C. § 2518(10)(a)(ii) have not been conclusively established as evidenced by the Supreme Court's statement in *Dahda v. United States* that it need not resolve the question of "which kind of defects subparagraph (ii) covers." *Dahda v. United States*, 138 S. Ct. 1491, 1498 (2018). However, the Court held that "subparagraph (ii) [of § 2518(10)(a)] covers at least an order's failure to include information that § 2518(4) specifically requires an order to contain." *Id.*

Section 2518(4) requires that an order must specify:

(a) the identity of the person, if known, whose communications are to be intercepted;

(b) the nature and location of the communications facilities as to which, or the place where, authority to intercept is granted;

(c) a particular description of the type of communication sought to be intercepted, and a statement of the particular offense to which it relates;

(d) the identity of the agency authorized to intercept the communications, and of the person authorizing the application; and

(e) the period of time during which such interception is authorized, including a statement as to whether or not the interception shall automatically terminate when the described communication has been first obtained.

18 U.S.C. §§ 2518(4)(a)-(e).  Therefore, "[a]n order lacking [this] information would deviate from the uniform authorizing requirements that Congress explicitly set forth, while also falling literally within the phrase of 'insufficient on its face.'"  *Dahda*, 138 S. Ct. at 1498.

In the instant matter, Romeu asserts that the Order is facially insufficient because both the District Attorney's application (Doc. 38-1) and the issuing Judge's Order (Doc. 38-2) assert that there is "probable cause to believe normal investigative techniques (other than the relief presently requested) were tried and failed, or reasonably appear to be unlikely to succeed if tried or are too dangerous to employ."  (Doc. 39, at 24 (quoting Doc. 38-1, ¶ 5.c.; Doc. 38-2, at p. 3, ¶ c)).  On this basis, Romeu posits that "the District Attorney's application and the judge's order suggest that the judge was misinformed concerning the correct legal standard for authorizing interception and that the judge in fact found that the application met a lower standard than mandated by Title III."  (Doc. 39, at 24-25).

The Court rejects Romeu's suggestion as it is not supported by law or fact.  Romeu does not address the requirements of § 2518(4) which are clearly met in this case. The Order identifies Angel Romeu, David Bainbridge Jr., and others as yet unknown as the people whose communications are to be intercepted pursuant to § 2518(4)(a).  (*See* Doc. 38-2, ¶ 1).  The Order identifies the nature and location of the communications as Schuylkill County pursuant to § 2518(4)(b).  *See id.*  The Order enumerates the involved offenses – 18

58

Pa. C.S. § 903 (conspiracy); 35 P.S. § 780-113(a)(3) (delivery and/or possession with intent to deliver a controlled substance), 18 Pa. C.S. § 911 (corrupt organization), and 18 Pa. C.S. § 5111 (dealing in proceeds of unlawful activity) – pursuant to § 2518(4)(c). *See id.* The Order identifies Christine Holman, John Fegley, Andrew Serina, and Jennifer Lehman as the individuals authorized to supervise the interception of the communications pursuant to § 2518(4)(d). (*See* Doc. 38-2, ¶ 7). Finally, pursuant to § 2518(4)(e), the Order identifies a period of thirty days to conduct the interception. (*See* Doc. 38-2, ¶ 2). Accordingly, the Order satisfies the basic requirements for facial sufficiency identified by Congress and the Supreme Court. *Dahda*, 138 S. Ct. at 1498.

Without citation to authority, Romeu layers another requirement onto those set out in § 2518(4), i.e., that the issuing judge must make a finding *in writing* that he has determined that the wiretap is "necessary" and, if he has not done so, the judge failed to make the requisite findings to authorize the wiretap. (*See* Doc. 51, at 7-8). In other words, Romeu reads the statute to require that a judge's determinations under § 2518(3) be in writing in the authorizing order and, if they are not, the order is facially deficient under § 2518(10)(a)(ii).

The Court of Appeals for the Third Circuit disagrees:

Section 2518(3) authorizes a judge to issue an ex parte order permitting electronic surveillance after the judge *determines, inter alia,* that normal investigative procedures have been tried and failed or appear unlikely to succeed if attempted or are too dangerous and that probable cause exists to believe that the place at which electronic surveillance is to be conducted is being used in connection with an offense. Nothing in the language of this section compels the judge to set forth the required findings in writing. As one court stated: "[t]here is nothing in § 2518(3)(c) which requires that particular

words be used in the requisite finding or indeed that the finding be actually expressed in words rather than by act of the judge." *United States v. Tortorello*, 342 F.Supp. 1029, 1036 (S.D.N.Y.1972), *aff'd*, 480 F.2d 764 (2d Cir.1973), *cert. denied*, 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973). *See also, United States v. Escandar*, 319 F.Supp. 295, 304 (S.D.Fl.1970) ("Section 2518(3) requires only that the authorizing judge make a determination that normal investigative procedures have been tried and appear likely to fail. There is no specific mandate that such determination be reflected in the written order.").

Based on the language of the statute, we can conclude that the judge's act of signing the Order is sufficient evidence that the judge made the findings required under § 2518(3) of the statute.

*United States v. Traitz*, 871 F.2d 368, 376–77 (3d Cir. 1989). In *Traitz*, the judge issuing the order had made written findings on subsections (a) and (b) of § 2518(3), but the order did not contain written findings on subsections (c) and (d). 871 F.2d 876. Although the appellants argued that because the judge issuing the order made written findings as to two of the required factual findings it was impermissible to find that the judge intended by his signature to make the statutory findings, the Circuit Court found the argument without merit:

Appellants argument misses the point. This Court is required to determine if written findings are required in order to satisfy the requirements of 2518(3). Once we determine that the findings need not be made in writing it is irrelevant whether the district court judge made some or none of the findings expressly cannot alter this Court's determination of whether or not the statute, 2518(3), compels the findings to be so made.

*Traitz*, 871 F.2d at 377 n.4. *Traitz* also rejected the argument that § 2518(3) findings needed to be in writing to facilitate proper review by the district court, finding the argument without merit because

in order to review the district court's decision to enter an *ex parte* order allowing electronic surveillance this Court need only look to the affidavit which was presented to the district court in support of the government's application. This in fact is the practice that has developed. *See United States v. Martinez,* 588 F.2d 1227 (9th Cir.1978); *United States v. Armocida,* 515 F.2d 29 (3d Cir.), *cert. denied,* 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975). Thus, it cannot be said that the findings of fact required to be made pursuant to § 2518(3) must be made in writing in order for an appellate court to have a "clear understanding of the trial court's judgment." *See Feely v. United States,* 337 F.2d 924, 935 (3d Cir.1964).

*Traitz,* 871 F.2d at 377.

The Third Circuit's clear determination that an issuing judge's determinations concerning the requirements set out in § 2518(3) need not be made in writing in the authorizing order forecloses Romeu's conclusory assertion to the contrary. Further, because the issuing Order satisfies the requirements of § 2518(4), Romeu has presented no basis upon which the Court can conclude that the authorizing Order was facially deficient. Thus, his assertion that evidence obtained pursuant to the authorization must be suppressed pursuant to 18 U.S.C. § 2518(10)(a)(ii) is without merit.

C. *Compliance with Title III Sealing Requirements Pursuant To 18 U.S.C. § 2518(8)(a)*

Romeu's final argument is that "the sealing order shows that interception stopped on April 9, 2016, a Saturday, but the records were not sealed until April 12, 2018 [*sic*], a Tuesday, a three day gap." (Doc. 39, at 53). Romeu contends that "[t]his gap calls for an explanation, and if this explanation is not satisfactory, the Court should suppress the records" pursuant to 18 U.S.C. § 2518(8)(a). (*Id.*).

Title III "regulates the interception of wire, oral, and electronic communications" and "[e]xcept under extraordinary circumstances . . . electronic surveillance may be conducted only pursuant to a court order." *United States v. Ojeda Rios*, 495 U.S. 257, 259 (1990) (internal citations omitted).

Pursuant to 18 U.S.C. § 2518(8)(a):

> The contents of any wire, oral, or electronic communication intercepted by any means authorized by this chapter [18 U.S.C. § 2510, *et seq.*] shall, if possible, be recorded on tape or wire or other comparable device. The recording of the contents of any wire, oral, or electronic communication under this subsection shall be done in such a way as will protect the recording from editing or other alterations. Immediately upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions. Custody of the recordings shall be wherever the judge orders. They shall not be destroyed except upon an order of the issuing or denying judge and in any event shall be kept for ten years. Duplicate recordings may be made for use or disclosure pursuant to the provisions of subsections (1) and (2) of section 2517 of this chapter for investigations. The presence of the seal provided for by this subsection, or a satisfactory explanation for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any wire, oral, or electronic communication or evidence derived therefrom under subsection (3) of section 2517.

18 U.S.C. § 2518(8)(a). "The primary thrust of § 2518(8)(a) . . . and a congressional purpose embodied in Title III in general, . . . is to ensure the reliability and integrity of evidence obtained by means of electronic surveillance." *Ojeda Rios*, 495 U.S. at 264 (internal citations omitted). Section 2518(a) "serves a prophylactic function. It precludes the government from using an electronic surveillance wiretap that has not been timely sealed under judicial supervision." *United States v. Carson*, 969 F.2d 1480, 1497 (3d Cir. 1992).

A violation of § 2518(8)(a) "requires suppression if the sealing was not 'immediate' and if the government fails to provide any 'satisfactory explanation for the delay.'" *United States v. Bansal*, 663 F.3d 634, 651 (3d Cir. 2011) (quoting *Ojeda Rios*, 495 U.S. at 264-68); *see also United States v. Quintero*, 38 F.3d 1317, 1325 (3d Cir. 1994) ("In *United States v. Ojeda Rios*, the Supreme Court noted that § 2518(8)(a) contains 'an explicit exclusionary remedy for noncompliance with the sealing requirement.'"). The Supreme Court determined that, pursuant to § 2518(8)(a), a seal had to be "obtained *immediately* upon expiration of the underlying surveillance order." *Ojeda Rios*, 495 U.S. at 263 (emphasis added).

"Whether a sealing occurred as soon as practical after the expiration of an order is a question of fact for the district court." *Carson*, 969 F.2d at 1492. "'As soon as practical' means as soon as is reasonably feasible given the administrative procedures which necessarily must be undertaken prior to sealing." *Carson*, 969 F.2d at 1496. If the Court finds that the sealing did not occur as soon as practical, then it must determine whether the government has provided an objectively reasonable and satisfactory explanation for the delay in sealing. *Carson*, 969 F.2d at 1492; *see also Quintero*, 38 F.3d at 1327 (explaining that to assess whether the government has supplied a satisfactory explanation for the delay in sealing, a court is required to examine the reasons supplied by the government and the government must prove "'the *actual reason* for the sealing delay rather than an *excuse* for some ulterior purpose or administrative bungle.") (italics in original) (quoting *United States v.*

*Vastola*, 989 F.2d 1318, 1323 (3d Cir. 1993)).  Nonetheless, "[a] recognition that allowances must be made for practical realities is implicit in Title III" and delays in sealing "should be judged by practicality." *Carson*, 969 F.2d at 1490.

The Third Circuit has therefore recognized that "there may be limited special circumstances apart from the administrative practicalities of obtaining a sealing order that would justify some delay." *Id.* at 1498.  In *Carson*, the Court explained:

> there are two kinds of justifiable government delays under the statutory scheme. First, there are the relatively short delays necessitated by the process required to comply with the provisions of the Act; administrative delays for want of a better term. Second, there are the sometimes longer delays attributable to non-administrative, objectively reasonable causes like understandable mistakes of law and interference from unexpected, extrinsic events beyond the government's control.

*Id.* at 1488.  The Circuit has "emphasize[d] that this first type of delay concerns the short delays *related directly* to readying the tapes for sealing." *Quintero*, 38 F.3d at 1326 n.5 (italics in original) (quoting *Carson*, 969 F.2d at 1489, and citing as examples "gathering the tapes, putting them in boxes and taking the tapes to the supervising judge.").

In sum, to determine whether one or more of the wire tapes should be suppressed because of a delay in sealing under § 2518(8)(a), the Court must ask two questions.  First, whether the tapes were sealed "immediately", *i.e.* "sealed either as soon as was practical after . . . the actual surveillance ended, or as soon as practical after . . . the final extension order expired.'" *Carson*, 969 F.2d at 1491 (quoting *United States v. Vastola*, 915 F.2d 865, 875 (3d Cir. 1990) (hereinafter "*Vastola II*")).  If the tapes were sealed "as soon as

practical," the Court's inquiry ends and the tapes at issue need not be suppressed because the government has complied with the sealing requirements of § 2518(8)(a). *Carson*, 969 F.2d at 1491. However, if the tapes were not sealed immediately, the Court must ask the second question: "whether the government has given a satisfactory explanation for the sealing delay that was objectively reasonable." *Id.* at 1491 (citing *Ojeda Rios,* 495 U.S. at 267; *Vastola II,* 915 F.2d at 870). Only if the government offers such an explanation can the tapes be admissible. *Id.*

Here, the surveillance ended on a Saturday, and the records were sealed within seventy-two hours, i.e. on the following Tuesday. (Doc. 30, at 38). The Third Circuit has held that an intervening weekend may reasonably delay the period in which it is practical to seal the record. *See Williams*, 124 F.3d 411, 429-30 (3d Cir. 1997); *Carson*, 969 F.2d 1480, 1498 (3d Cir. 1992). The Government contends that "[t]he short delay was due to the intervening weekend and the Superior Court's availability." (Doc. 50, at 38). The short delay, therefore, was due to the exact same administrative concerns discussed in *Carson*. *See Carson*, 969 F.2d at 1488. Accordingly, the Court finds that the Government sealed the records "as soon as was practical," *id.* at 1491, and Romeu's argument that the recordings should be suppressed pursuant to 18 U.S.C. § 2518(8)(a) is without merit.

## IV. CONCLUSION

For the above-stated reasons, the Court concludes that Defendant's "Motion to Suppress Wire and Electronic Communications Obtained in Violation of Title III and the

United States Constitution" (Doc. 37) is properly denied. An appropriate Order will be filed

simultaneously with this Memorandum Opinion.

Robert D. Mariani
United States District Judge

66